IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DAVID F. CALABOTTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| PHIBRO ANIMAL HEALTH CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| Serve: | ) | |
| CT Corporation System – Agent | ) | |
| 208 So. LaSalle St, Suite 814 | ) | |
| Chicago, IL  60604 | ) | |

## COMPLAINT

Plaintiff David Calabotta, by and through his attorneys, states the following cause of action:

### Jurisdiction and Venue

1. Plaintiff brings this action under the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.* as amended ("ADA").

2. Jurisdiction of this Court is founded upon 28 U.S.C. §1331 and 42 U.S.C. §12117(a), which incorporates by reference 42 U.S.C. §2000e-5(f)(3).

3. Venue is proper under 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3)..

4. Plaintiff has satisfied the administrative prerequisites to suit under ADA.  On or about June 10, 2017, Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  On July 7, 2017, the EEOC issued to Plaintiff a Notice of Right to Sue.  This action is filed within ninety days of its issuance.

1

## Parties

5. Plaintiff David Calabotta was, at all relevant times, an individual residing in Quincy, Illinois.

6. At all relevant times, Plaintiff was employed by Defendant Phibro Animal Health Corporation ("Phibro" or "the Company") and worked in Quincy, Illinois.

7. At all relevant times, Phibro has been New Jersey corporation doing business in the state of Illinois in Springfield and has continuously had over 15 employees.

8. At all relevant times, Phibro has continuously been an employer engaged in an industry affecting commerce under 42 U.S.C. §12111(5) and 42 U.S.C. §12111(7), which incorporates 42 U.S.C. §§2000e(g) and (h).

9. At all relevant times, Phibro has been a covered entity under 42 U.S.C. §12111(2).

## Statement of Claims

10. Plaintiff David F. Calabotta was hired by Phibro in 2008 and was, until the summer of 2016, Vice President of Marketing and Technology Deployment in Defendant Phibro's Prince Agri Products business unit located in Quincy, Illinois.

11. Defendant Phibro is a publicly-traded corporation which develops, manufactures and markets animal food additives, including but not limited to products designed to prevent and control disease and enhance nutrition in dairy cows, beef cattle, swine and poultry. The Prince Agri Products business unit, in which Plaintiff was employed, was responsible for marketing, product management, research and development, and technical support and services of nutritional specialty products designed to support animal health and productivity.

12.     As Vice President of Marketing and Technology Deployment in the Company's Prince Agri Products business unit, Plaintiff managed a team that expanded under his leadership from 8 people in 2009 to 43 people by 2016. His team was responsible for managing the existing product portfolio; identifying new products; conducting research on their use and effectiveness; developing programs to manage and market them for growth and profitability; training, promotions and customer and sales support.

13.     During his tenure in the position, Plaintiff's team launched new products and new product lines within the existing portfolio, refined existing products, obtained licenses for high potential products, streamlined the product portfolio, and increased disciplined marketing, product management and research and technical services and technical training programs, thereby increasing the Prince Agri Products business unit's profit margin from under 30 percent to almost 50 percent. As a result of these activities, the Prince Agri Products business unit was the fastest growing of Phibro's business units.

14.     Defendants rated Plaintiff's performance every year as meeting and exceeding expectations; they noted in performance reviews over the years that he worked "extremely hard," "significantly strengthened" his team over the years, developed "new and creative ways" to market the Company's products, did an "excellent job" in creating training modules to support the products, did "a great job managing the research program," "enhanced leadership management and harmony of the group," and generated "new credibility and cache in the industry and academic community" for the Company's products.

15.     In October, 2014, Plaintiff's wife Beth Calabotta, who had been in remission from an earlier bout with breast cancer in 2008, was diagnosed with recurrent breast cancer which by 2015 had developed into metastatic breast cancer and spread to her liver, bones and brain.

16. Plaintiff was open about his wife's health issues and discussed her condition and prognosis with his co-workers and superiors. Defendant was aware that there was no cure for Plaintiff's wife's cancer, that she was very seriously ill, that the treatments were not working, and that her condition would likely continue to deteriorate.

17. While he was actively involved in caring for his wife and assisting her in identifying and participating in treatment around the country, Plaintiff has continued to effectively lead his team and continued to meet his responsibilities to Defendant Phibro.

18. In June 2016, Mr. Dean J. Warras told Plaintiff that the Company was about to announce a reorganization of its operations, that his duties would be reduced, that his marketing responsibilities would move to the Company headquarters in Teaneck, New Jersey, and that his new position title would be Vice President, Research and Technical Support.

19. The new position significantly reduced Plaintiff's responsibilities. He would no longer be responsible for marketing and product management, and once the reorganization was completed, his staff would be cut by 10 to 15 positions.

20. Mr. Warras also told Plaintiff that the Company was creating a new position for a Senior Vice President of Marketing and Product Management and that the position would be located at the Company headquarters in Teaneck, New Jersey.

21. Plaintiff asked Mr. Warras who would be considered for the new senior job, and Mr. Warras said the Company had hired a recruiting firm and would begin interviewing in the very near future.

22. When Plaintiff asked whether he would be considered for the new position, Mr. Warras replied "I did not think that you would be interested. The job is in New Jersey and with Beth's situation and all..." Plaintiff told Mr. Warras that he felt he should get serious

consideration for the job since he [Plaintiff] had put together Prince Agri Product's marketing and product management program. Plainitff told Warras that he would like to learn more about the position, and asked to see the job description for the new position.

23. Mr. Warras said that he would get Plaintiff a copy of the job description and talk to Defendant Phibro's senior managers in New Jersey about Plaintiff's interest in the new position.

24. Plaintiff also talked about his interest in the job to Mr. Daniel M. Welch who Plaintiff knew, as Senior Vice President for Human Resources, would be deeply involved in filling the senior position. He told Mr. Welch on two occasions that he felt he should get serious consideration for the job. On one occasion, Welch's response was "I hear you." On another, Welch said "I don't know if that is going to happen."

25. Around this same time in late June 2016, Plaintiff participated in a meeting with members of Phibro's Board and its Senior Management Team for the purpose of presenting a budget for Fiscal Year 2017. At the meeting, then Chief Operating Officer ("COO") Jerry Carlson said that he was "incredibly impressed" with the team that Plaintiff had put together. Calling Plaintiff's team "world class," he went on to say, "There is just not another marketing and technology team in the world like the one Dave Calabotta has put together and managed."

26. In early July 2016, sometime after the formal announcement of the reorganization, Mr. Warras told Plaintiff how appreciative he was of how Plaintiff had handled the reorganization and how he had helped the group as they evolved to the new organization. He said that Plaintiff had done a great job addressing the concerns of his staff members who were experiencing a lot of angst about how they would be affected, that he had responded maturely to the changes himself, and that he was very proud of him.

5

27. On or about July 7, 2016 Mr. Warras again assured Plaintiff that he would be considered for the position, but he had still not provided him a copy of the job description. During this conversation, Plaintiff again asked for the job description and Mr. Warras again said he would get it to him.

28. Shortly thereafter, Plaintiff learned that Kincannon & Reed, the executive search firm which had been hired to recruit for the position, was beginning to interview candidates.

29. Plaintiff never heard from Mr. Warras, Mr. Welch or the search firm about the position, despite his repeated and persistent requests that he be considered for the position.

30. Mr. Warras never provided him a copy of the job description.

31. Plaintiff was never interviewed for the job by the executive search firm, despite his excellent credentials and his record of superlative performance.

32. On or about Friday, July 22, 2016, Mr. Welch called Plaintiff on his cell phone and told him that he wanted to discuss events which had transpired at a national meeting of the American Dairy Science Association (ADSA), which Plaintiff had attended July 19th through the 23rd, along with several members of his team.

33. Later that evening Plaintiff spoke at length with Mr. Welch responding to questions about a serious problem with a presentation made by a member of his staff at the ADSA meeting, how he handled the problem during and after the presentation, and how he had addressed the problem with her and her supervisor.

34. At the conclusion of the conversation, Mr. Welch told him that he was suspending Plaintiff with pay pending further investigation of the events that occurred at the ADSA meeting. Plaintiff asked him what the accusation was which was being investigated, but Mr. Warras refused to provide any information.

35. On or about August 19, 2016, Mr. Warras and Mr. Welch met with Plaintiff. Mr. Welch told him that they had "corroborated the allegations" against him. He asked them what allegations, but they refused to tell him what the allegations were.

36. Plaintiff said that if the allegations related to what had transpired at the ADSA meeting, he still believed he had handled the situation appropriately. Mr. Welch told him they disagreed.

37. Plaintiff asked them, "Where do we go from here?" Mr. Warras responded "separation," and Mr. Welch handed Plaintiff a severance agreement and asked him for his company laptop, terminating Plaintiff's employment on August 19, 2016.

38. Throughout the last two years of his employment Mr. Warras asked Plaintiff many specific questions about his wife's illness and her prognosis, and Plaintiff understood that Mr. Warras was passing this information along to Mr. Welch.

39. Phibro COO Jerry Carlson and other senior Phibro executives also asked probing questions about Plaintiff's wife's condition and prognosis.

40. During the last few months of his employment, one of Plaintiff's co-workers, who was also a close friend, went to Mr. Welch and asked him whether Plaintiff would be able to take a leave of absence to care for his wife if that became necessary. Mr. Welch was non-committal in response to the question, saying only "there are programs available."

41. During a mid-year performance review meeting in early 2016, Mr. Warras told Plaintiff, "I don't know how you handle all that is on your plate."

42. On May 23, 2016, the Quincy Herald-Whig newspaper carried a prominent article headlined "LIVE UNTIL I DIE: Quincy woman with metastatic cancer focuses on goals,"

describing how Plaintiff's wife was handling her illness, for which the article said there was no cure. Mr. Warras told Plaintiff that he had read the article.

43. The Quincy Whig carried a follow-up article about Plaintiff's wife on June 28, 2016. Also in June, The Wall Street Journal carried an article on studies of cancer patients in which she was quoted and prominently featured in a photograph. Both articles were widely read by and discussed among Plaintiff's co-workers

44. Following a senior staff meeting on July 7, 2016, where senior staff had been invited to express their feelings and concerns about the reorganization, Mr. Warras told Plaintiff that Mr. Welch had told him he needed to talk to Plaintiff. He told Plaintiff that he and Mr. Welch did not like his attitude in the meeting and that he had come across as angry and unhappy.

45. Plaintiff told Mr. Warras that Warras did not know everything that was going on in his life, that if he was not smiling and happy, it was not necessarily about what was going on at Phibro. Plaintiff told him further that he was wrestling with a great deal and he was sorry if he came across angry.

46. The Company has a Performance Management Program which calls for coaching and counseling of employees with performance or conduct issues on the job. Numerous employees, including some who reported to Plaintiff, were placed on Performance Management Plans for inappropriate conduct in the work place.

47. Defendant never placed Plaintiff on any type of Performance Management Plan, nor was he ever formally counseled for performance or conduct issues. His performance reviews, including his 2015 review, mention no performance or conduct problems. In fact, he was rated overall for 2015 at 4 on a 5-point scale for performance that "Exceeded Expectations." A 4 on the company's performance rating scale is described as: "Performance clearly exceeded

the standard. Objectives attained were beyond the target. He/She displayed a number of personal strengths and competencies." In his mid-year review meeting in early 2016, Mr. Warras said that he was on track for another great year.

48.     Defendant discriminated against Plaintiff on account of his association with a person with a disability by, among other things, failing and refusing to consider him for the position Senior Vice President of Marketing and Product Management in or about July and August, 2016 and terminating his employment on August 19, 2016.

49.     Defendant, by its actions and failure to act, including but not limited to those described above, discriminated against Plaintiff because of his association with his wife, who was disabled at all relevant times, pursuant to ADA, 42 U.S.C. §§12112(b)(4).

50.     As a result of Defendant's actions and failures to act, Plaintiff has lost and continues to lose wages and other financial incidents and benefits of employment, has experienced emotional pain, suffering, humiliation, embarrassment, mental anguish, inconvenience and loss of enjoyment of life, and has incurred and will continue to incur attorneys' fees and costs in connection with this matter.

51.     The conduct of Defendants as described herein was willful, wanton, malicious and undertaken with evil motive or reckless disregard for Plaintiff's federally-protected rights. Consequently, Defendant's conduct warrants the imposition of punitive damages.

WHEREFORE, Plaintiff prays that this Court enter judgment in his favor against Defendant Phibro Animal Health, for lost wages and benefits, compensatory and punitive damages, prejudgment interest, as well as for appropriate equitable, declaratory and injunctive relief, attorneys' fees and costs and for such other relief as may be just and proper under the circumstances.

SEDEY HARPER WESTHOFF, P.C.
Attorneys for Plaintiff

*/s/ Mary Anne Sedey*_____
Mary Anne Sedey
2711 Clifton Ave.
St. Louis, MO 63139
314/773-3566
314/773-3615 (fax)
msedey@sedeyharper.com